# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

CHRISTOPHER SHAND,
                Plaintiff,

    v.

SCOTT SEMPLE, Commissioner,
    Connecticut Department of
    Correction,
    in his official capacity;
CRAIG BURNS, Chief of Psychiatric
    Services, Connecticut Department
    of Correction, in his official
    capacity;
NICK RODRIGUEZ, Warden,
    Northern Correctional Institution,
    in his official and personal
    capacities;
DERRICK MOLDEN, Deputy
    Warden, Northern Correctional
    Institution, in his official and
    personal capacities;
ANN COURNOYER, former Warden,
    Northern Correction Institution, in
    her personal capacity;
WILLIAM MULLIGAN, former
    Deputy Warden and Warden,
    Northern Correctional Institution, in
    his personal capacity;
MARK FRAYNE,
    in his personal capacity;
GERARD GAGNÉ,
    in his personal capacity;
MATTHEW PRIOR,
    in his personal capacity,
                Defendants.

No. 3:18-cv-10

**AMENDED COMPLAINT**

September 20, 2018

1

## INTRODUCTION

1.     Christopher Shand brings this complaint against Defendants for the cruel, inhuman, and degrading treatment that they have inflicted upon him over thirty-one months at Northern Correctional Institution (Northern CI). Mr. Shand suffers from long-standing and severe mental illness, yet Defendants have knowingly and repeatedly substituted punishment in lieu of treatment. The very people charged with Mr. Shand's care and custody, including Defendants Rodriguez, Molden, Mulligan, Cournoyer, Frayne, Gagné, and Prior, have subjected him to abject abuse, including chaining him in a cell for days on end.

2.     Northern CI is uniquely ill-suited to housing prisoners with mental illness. Mr. Shand is confined to his small, concrete cell for twenty-two or more hours per day. The isolative conditions at Northern CI cause prisoners' mental health to deteriorate and especially impact those who, like Mr. Shand, suffer from pre-existing mental illness. Under these conditions, Mr. Shand has occasionally resorted to acts of self-harm as well as non-violent acts of protest. Defendants have responded with violence, forcibly removing Mr. Shand from his cell and chaining him down like an animal for days at a time.

3.     Defendants' ongoing mistreatment and abuse of Mr. Shand has caused him profound suffering and continues to pose a grave threat to his health, safety, and wellbeing.

4.      Mr. Shand's mistreatment comes as a result of policies approved at the highest levels of the Connecticut Department of Correction (CDOC), including by Defendants Semple and Burns. The deleterious effects of isolative confinement are well known, yet Defendants have failed to take effective action to address these long-standing deficiencies on a policy level. Nor have Defendants taken steps to remedy Mr. Shand's individual circumstances. By knowingly confining Mr. Shand under conditions that are certain to cause great suffering, Defendants have inflicted cruel and unusual punishment on him in violation of the Eighth Amendment to the U.S. Constitution.

5.      Mr. Shand respectfully asks this Court to order Defendants to provide him with appropriate mental health care, to cease punishing him for his mental health symptoms, and to cease subjecting him to chaining under all circumstances.


## JURISDICTION

6.      Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the U.S. Constitution and 42 U.S.C. § 1983.

## VENUE

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

8.     Plaintiff Christopher Shand is an adult committed to the Connecticut Department of Correction and currently confined in Northern Correctional Institution in Somers, Connecticut.

9.     Defendant Scott Semple is the Commissioner of the Connecticut Department of Correction. As such, he is the legal custodian of all prisoners confined in CDOC facilities and is responsible for the safe, secure, and humane housing of those prisoners. He has the capacity to provide the injunctive and declaratory relief Mr. Shand seeks, including Mr. Shand's transfer from Northern CI, the provision of adequate mental health care, and the cessation of the use of in-cell restraints.

10.     The head of the Department of Correction is designated as administering Connecticut's system of carceral liens, under which people imprisoned by the state are charged money for the time they were held. *See* Conn.

Gen. Stat. §§ 18-85a to -85b. As such, Defendant Semple calculates the amount of money allegedly owed to Connecticut by those the State has imprisoned; designates a person or agency to perfect liens against prisoners and former prisoners; is due the proceeds of any such amounts collected; and requests that the State's attorney general sue those determined to have outstanding balances in order to collect amounts allegedly owed.

11.    The Commissioner of Correction has routinely used Conn. Gen. Stat. §§ 18-85a and -85b to perfect carceral liens against prisoners who sue, and/or those who secure monetary relief against the Department or its employees via 42 U.S.C. § 1983.

12.    At all times relevant hereto, Defendant Semple has acted under color of state law. Defendant Semple is sued in his official capacity.

13.    Defendant Craig Burns is the Chief of Psychiatric Services of the Connecticut Department of Correction. As such, he is responsible for providing mental health care and treatment to prisoners confined in CDOC facilities. He has the capacity to provide most of the injunctive and declaratory relief sought by Mr. Shand, including the provision of adequate mental health care and the cessation of punitive measures, including the use of in-cell restraints, as response to mental illness. At all times relevant hereto, he has acted under color of state law. Defendant Burns is sued in his official capacity.

14.     Defendant Nick Rodriguez is the Warden of Northern Correctional Institution. As such, he is the legal custodian of all prisoners confined at Northern CI and is responsible for the safe, secure, and humane housing of those prisoners. He has the capacity to provide most of the injunctive and declaratory relief sought by Mr. Shand, including the provision of adequate mental health care and the cessation of the use of in-cell restraints. In addition, upon information and belief and pursuant to CDOC Administrative Directive 6.5, Defendant Rodriguez approved and signed off when Defendant Prior subjected Mr. Shand to in-cell restraints, including in January and February 2018. At all times relevant hereto, he has acted under color of state law. Defendant Rodriguez is sued in his official and personal capacities.

15.     Defendant Ann Cournoyer was the Warden of Northern Correctional Institution in 2015 and part of 2016. As such, she was the legal custodian of all prisoners confined at Northern CI and is responsible for the safe, secure, and humane housing of those prisoners. Upon information and belief and pursuant to CDOC Administrative Directive 6.5, Defendant Cournoyer approved and signed off when Mr. Shand was subjected to in-cell restraints on multiple occasions, including in response to his threats of self-harm. At all times relevant hereto, she acted under color of state law. Defendant Cournoyer is sued in her personal capacity.

16.     Defendant Derrick Molden is the Deputy Warden of Northern Correctional Institution. Upon information and belief and pursuant to CDOC Administrative Directive 6.5, Defendant Molden approved and signed off when Mr. Shand was subjected to in-cell restraints on multiple occasions, including in response to his threats of self-harm. At all times relevant hereto, he acted under color of state law. Defendant Molden is sued in his personal capacity.

17.     Defendant William Mulligan is the Deputy Warden of Northern Correctional Institution. Upon information and belief and pursuant to CDOC Administrative Directive 6.5, Defendant Mulligan approved and signed off when Mr. Shand was subjected to in-cell restraints on multiple occasions, including in response to his threats of self-harm. At all times relevant hereto, he acted under color of state law. Defendant Mulligan is sued in his personal capacity.

18.     Mark Frayne is a psychologist and oversaw the provision of mental health care for all prisoners at Northern CI for the entire duration relevant to this complaint until, upon information and belief, he was transferred out of Northern CI on or about July 1, 2018. Defendant Frayne personally evaluated Mr. Shand in 2015 and concluded that Mr. Shand did not have a mental illness and refused to provide him with treatment. On numerous occasions, including in January and February 2018, Defendant Frayne oversaw Mr. Shand's placement in chains, even

when the underlying behavior, including self-harm, related to his untreated mental illness.

19.     Gerard Gagné is a psychiatrist and oversaw the provision of psychiatric medications for all prisoners at Northern CI for the entire duration relevant to this complaint until, upon information and belief, he was transferred out of Northern CI during the summer of 2018. Defendant Gagné personally evaluated Mr. Shand in 2015 and discontinued the psychiatric medications that Mr. Shand had been taking while in DOC custody. Defendant Gagné discontinued the medications suddenly and completely and without an alternative treatment plan in place. On numerous occasions, Mr. Shand requested to be placed back on medications, but Defendant Gagné ignored and/or refused those requests.

20.     Defendant Matthew Prior is a Lieutenant for the Department of Correction and oversees the unit at Northern CI where Mr. Shand was confined in 2017 and 2018. Defendant Prior personally directed that Mr. Shand be placed in chains in January and February 2018 and he struck Mr. Shand in the face. Defendant Prior also removed Mr. Shand's mattress from his cell, forcing Mr. Shand to rest, if at all, only on the cold bed frame.

## FACTUAL ALLEGATIONS

## Northern Correctional Institution

21.    Northern Correctional Institution (Northern CI), Connecticut's only "supermax" prison, is located in Somers, Connecticut.

22.    The conditions at Northern CI are purposely punitive and restrictive. Its six housing units radiate outwards from a long, sloped, windowless corridor, meant to give the impression of walking underground. Inside the units, concrete walls and mirrored windows at irregular angles create a disorienting and kaleidoscopic effect. There is no view outdoors and no daylight, except for a narrow window at the back of each concrete cell. The doors of the cells are solid steel with a small "trap" in each door that staff use to pass food to the prisoner inside or to handcuff the prisoner.

23.    The most restrictive statuses at Northern CI are Administrative Segregation and Security Risk Group. The sixty or so men under these designations spend twenty-three hours per day locked in their cells. To leave their cells, prisoners must subject themselves to visual strip searches and shackles on their hands and feet, bound by a tether chain. Shackles remain even while showering. Five days a week, prisoners may take "recreation" in a steel cage surrounded by high concrete walls. The only view is the sky. Prisoners have little

human interaction and communicate with each other through air vents and sink drains.

24.    The effects of isolation are well-documented and debilitating. Isolation exacerbates psychiatric disabilities and can lead to cognitive deterioration and psychotic symptoms, including paranoia, hallucinations, and self-harming behaviors. Isolation can also aggravate—and in some cases cause—physical and/or psychiatric disabilities, including but not limited to gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, agitation, depression, and profound fatigue. Forced double-celling under these conditions, as is the practice at Northern CI, can exacerbate, not lessen, isolation's negative effects.

25.    Because of the risks posed by isolation, a consensus has developed among international and U.S. institutions responsible for human rights and the treatment of prisoners that individuals with mental illness should be placed in isolation only if absolutely necessary and for only brief periods of time. The United Nations Standard Minimum Rules for the Treatment of Prisoners (known as the "Mandela Rules") prohibit isolation in the case of prisoners with psychiatric disabilities when those conditions would exacerbate their disabilities. G.A. Res. 70/175 (Dec. 17, 2015). American Bar Association standards recommend that "no prisoner diagnosed with serious mental illness should be placed in long-term

segregated housing." Am. Bar Ass'n, *ABA Standards for Criminal Justice: Treatment of Prisoners* 55 (3d ed. 2011). The National Commission on Correctional Health Care states that "mentally ill individuals . . . should be excluded from solitary confinement of any duration." Nat'l Comm'n on Corr. Health Care, *Position Statement on Solitary Confinement* (Apr. 2016).

26.     Despite these known effects, Defendants isolate prisoners with mental illness at Northern CI, putting them at substantial risk of serious harm. Once in isolation, the prisoners' disabilities and psychiatric symptoms generally worsen, often catastrophically.

27.     Defendants have failed to provide staff with proper trainings in the identification and management of mentally ill prisoners. Thus, when prisoners manifest their illness through self-harm or other behaviors, Northern CI staff often respond with force rather than with appropriate mental health interventions.

28.     Defendants routinely subject prisoners, including those with mental illness, to in-cell restraints. Staff place a prisoner into a bare cell and chain him up with a combination of handcuffs, leg shackles, a belly chain, and a chain connecting the legs and arms. To transport a prisoner to the cell where he will be placed in in-cell restraints, Northern CI staff often resort to subduing the prisoner with chemical agents and physical force.

29.     Northern CI staff commonly place prisoners in in-cell restraints as punishment for past conduct, including for common, nonviolent infractions. For example, one infraction that frequently results in in-cell restraint placement is covering up a cell window with paper, a behavior that prisoners engage in as a last resort to seek the attention of Northern CI staff.

30.     In some cases, Northern CI employees respond to suicide attempts and acts of self-harm by conducting violent cell extractions and using in-cell restraints. Even when staff members do recognize a prisoner's risk of serious self-harm, the response is largely punitive and consists of placement into an observation cell, often under four-point restraints.

31.     Defendants and their subordinates have a policy and practice of placing prisoners in in-cell restraints for days at a time and far longer than is necessary for safety and security. Prisoners are commonly shackled in in-cell restraints for a period of seventy-two hours and sometimes longer.

32.     Chaining someone for a single day, let alone three, denies them essential human dignity and would cause any person tremendous pain and suffering. In the face of mental illness and in combination with the isolative and punitive conditions at Northern CI, the effects are devastating. The trauma of being chained continues a downward cycle that can trap a person with mental illness at Northern CI for many months or even years.

**Plaintiff Shand**

33.     Mr. Shand has suffered from serious mental illness since childhood. Medical professionals over the years have diagnosed Mr. Shand with a variety of conditions, including mood disorder, depression, bipolar disorder, and traumatic brain injury. Beginning as early as age twelve, Mr. Shand has periodically engaged in acts of self-harm and suicide attempts. On several occasions, these acts resulted in hospitalization.

34.     Mr. Shand also has a long history of respiratory problems due to asthma.

35.     Mr. Shand first received medication to treat his mental illness when he was a child. As an adult, he has taken medications including but not limited to Risperdal, Thorazine, Wellbutrin, and Prozac for his conditions.

36.     Mr. Shand has been in CDOC custody since December 2013. Shortly before arriving in CDOC custody, Mr. Shand attempted suicide while incarcerated at Rikers Island in New York City.

37.     CDOC has recognized Mr. Shand's serious mental illness at various points during his incarceration. Upon Mr. Shand's 2013 transfer from New York's custody to Connecticut's, CDOC assigned him a mental health score of MH5, the highest score, indicating that CDOC determined that he had a serious mental illness. In July 2016, Mr. Shand attempted suicide by overdose while housed at

MacDougall-Walker Correctional Institution (Walker CI). Soon after, CDOC transferred Mr. Shand to Garner Correctional Institution, where CDOC consolidates care and treatment for adult male prisoners with significant mental health issues.

38.    Mr. Shand's mental health issues have been aggravated by ongoing disputes about his religious diet. Mr. Shand, who is Jamaican American, is a member of the Rastafarian faith. Under the precepts of his religion, he may not eat any animal products. Defendants refused to provide Mr. Shand a diet that conforms to the requirements of Rastafarianism. Instead, they assigned Mr. Shand the "Common Fare" diet, which includes dairy and eggs.

39.    CDOC's failure to resolve Mr. Shand's concerns about his religious diet has exacerbated Mr. Shand's mental illness. Starting in 2014, Mr. Shand has periodically refused to eat on a regular basis in response to CDOC's ongoing refusal to provide a religiously observant diet. Mr. Shand has had difficulty tolerating psychiatric medicine while restricting his food intake.

40.    In August 2017, CDOC filed a verified motion in Connecticut Superior Court for a permanent injunction to permit CDOC to force-feed Mr. Shand. In support of its motion, CDOC asserted that Mr. Shand "has a history of hearing voices for which antipsychotic medications have been prescribed."

41.    Despite its own recognition of Mr. Shand's serious mental illness and its own role in exacerbating his symptoms by denying a religiously appropriate diet, CDOC has denied Mr. Shand treatment, instead subjecting him to lengthy periods of isolation and other abuses at Northern CI.

42.    Cumulatively, Mr. Shand has spent thirty-one of the last forty-two months confined at Northern CI. In January 2015, CDOC transferred Mr. Shand to Northern CI and kept him there until approximately May 2017, when he was transferred to Walker CI. In December 2017, CDOC returned Mr. Shand to Northern CI, where he remains to this day.

43.    Upon arrival at Northern CI in January 2015, Defendants Frayne and Gagné determined that Mr. Shand did not have any mental illness requiring medication. They reached this decision despite the fact that Mr. Shand was previously prescribed antipsychotics—including Thorazine, Loxapine, and Risperdal—and antidepressants—including Wellbutrin, Celexa, and Prozac—while in custody at other CDOC facilities. They promptly stopped his medication and denied his requests to be placed back on medication.

44.    While at Northern CI, Mr. Shand's mental health symptoms worsened. Off of his medication and unable to speak to relatives, Mr. Shand felt his mental health symptoms begin to snowball. Unable to cope, he withdrew into himself. He started to have nightmares and often cried out in his sleep. He found

himself alternating between despair and extreme agitation. He began to self-harm, scratching himself and banging his head, and fantasized about ending his own life.

45.     Mr. Shand is acutely aware of his mental health needs and has repeatedly sought treatment. He draws strength from his loving family, including his two young children, and wants to rehabilitate himself while incarcerated.

46.     In seeking adequate mental health care, Mr. Shand has written letters, filed request forms, and requested health-services reviews from CDOC on many occasions. Defendants Frayne and Gagné routinely ignored these requests, instead accusing Mr. Shand of "malingering."

47.     Mr. Shand received punishment—not treatment—for behaviors that are symptoms of his mental illness, such as banging his head and threatening his own life. Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, and Prior did not attempt meaningful mental health interventions to address Mr. Shand's behavior before subjecting him to discipline and punishment, including prolonged chaining. During cell extractions, Northern CI staff repeatedly sprayed Mr. Shand with chemical agents, despite their knowledge that he suffers from asthma.

48.     Over the cumulative thirty-one months that Mr. Shand has been confined at Northern CI, Mr. Shand has been subjected to in-cell restraints approximately ten times. At various points, Mr. Shand has been chained for twenty-four and up to seventy-two hours at a time. On several occasions, including

in January and February 2018, Mr. Shand has alternated between in-cell and four-point restraints for days at a time.

49.    In late January 2018, Defendants Frayne, Prior, Molden, and Rodriguez oversaw Mr. Shand's repeated placement into in-cell and/or four-point restraints. Over the course of slightly more than a week, from about January 29 to about February 16, 2018, CDOC chained Mr. Shand cumulatively for approximately one hundred hours, or five days.

50.    On January 29, 2018, a CDOC employee delivered Mr. Shand a food tray containing non-vegan items. Mr. Shand, frustrated by CDOC's ongoing refusal to provide a religiously appropriate diet, responded by shoving the tray away from his cell. Mr. Shand did not intend to injure the employee, and, upon information and belief, the employee suffered no injury nor was he at risk for any injury.

51.    Defendant Prior accused Mr. Shand of assaulting the employee and ordered him to "cuff up." Mr. Shand put his hands through the cell trap to comply, and several officers, including Defendant Prior, entered Mr. Shand's cell.

52.    The officers then marched Mr. Shand to Cell 102, which CDOC uses for in-cell restraints. The cell, which prisoners refer to as the "strip cell," is devoid of anything except a sink, toilet, and bed. Cell 102, which regularly holds prisoners in acute distress, was covered in urine and feces.

53.    Officers then shackled Mr. Shand at the ankles and wrists and looped a tether chain around the shackles. Contrary to CDOC Administrative Directive 6.5, the officer looped the tether chain so that Mr. Shand could not fully extend his back and remained in a stooped position. Mr. Shand informed Defendant Prior that the cuffs were too tight and that he was unable to stand up straight, but Defendant Prior ignored him.

54.    Mr. Shand further informed Defendant Prior that he had not struck the employee but had only refused his tray; he asked that Defendant Prior review the videotape of the incident. Defendant Prior left, and upon his return some hours later, he admitted that Mr. Shand had not assaulted the employee.

55.    Mr. Shand requested to return to his cell, but Defendant Prior refused. When Mr. Shand protested, Defendant Prior struck Mr. Shand, who was shackled, in the face.

56.    When he finally returned to his cell, Mr. Shand discovered that CDOC employees had destroyed much of his personal property and torn up photos of his children. In protest, he covered his cell window to request the return of his property. Several employees then threatened to return Mr. Shand to in-cell restraints, at which time Mr. Shand stated that he would start banging his head.

57.    CDOC staff again shackled Mr. Shand in in-cell restraints. He was shackled for over twenty-four hours, even overnight, as he tried to sleep.

58.    Defendant Prior stripped Mr. Shand of his mattress. Mr. Shand sat on the cold metal frame, shivering. He was without the mattress for about seven and a half hours.

59.    On February 2, 2018, at Defendant Frayne's orders, CDOC staff brought Mr. Shand to the medical unit, where they placed him on four-point restraints, meaning that he was chained at each foot and wrist to a metal bed frame.

60.    After Mr. Shand was taken out of four-point restraints, Defendant Frayne oversaw his placement, again, in four-point restraints in the medical unit. This second placement lasted approximately twenty-four hours.

61.    Defendant Frayne directed DOC staff to transfer Mr. Shand back to the housing unit and to place him on in-cell restraints. Mr. Shand spent approximately two and a half days in chains between February 5 and February 8, 2018.

62.    Between January 29 and February 16, Mr. Shand shuttled between Cell 102 and the medical unit. Altogether, he spent approximately five days in chains, either in in-cell or four-point restraints.

63.    Defendants imposed restraints repeatedly on Mr. Shand as punishment and for far longer than necessary to prevent any imminent threat of harm to himself or others.

64.     Upon information and belief and pursuant to CDOC Administrative Directive 6.5, Defendants Rodriguez and Molden signed off on Mr. Shand's repeated placements on in-cell restraints during that period.

65.     Defendant Frayne's cruelty between 2015 and 2018 caused Mr. Shand profound physical and psychological harm. In lieu of any medically recognized treatment for Mr. Shand's longstanding mental illness, Defendant Frayne subjected Mr. Shand to the psychological and physical torture of prolonged chaining and further isolation.

66.     Defendants Rodriguez, Cournoyer, Molden, and Mulligan had full knowledge of Mr. Shand's deteriorating mental health and the lack of treatment, but they repeatedly failed to intervene. Instead, they authorized perverse and abjectly cruel treatment, including prolonged chaining and further isolation.

67.     Defendant Prior has personally antagonized Mr. Shand on numerous occasions, such as by encouraging his officers to tamper with Mr. Shand's food and to interfere with Mr. Shand's sleep by banging on his cell door. Defendant Prior initially placed Mr. Shand on in-cell restraints during the January 2018 incident and removed Mr. Shand's mattress to heighten the severity of the punishment. Since the January 2018 incident, Defendant Prior has personally threatened that he would force Mr. Shand to withdraw his lawsuits "one way or another."

68.    As a result of Defendant Prior's threatening behavior, Mr. Shand has been too afraid to come out of his cell except for calls with his family and visits with his attorneys. For months, he has not been outside to the recreation cage, nor he has not taken a real shower, instead choosing to bathe himself using cold water from his cell sink.

69.    Defendants' actions have caused Mr. Shand to suffer from delusions, lose sleep and memory, have anxiety attacks, experience hallucinations, have suicidal ideations, engage in self-harm, contract a skin affliction and develop rashes, and suffer contusions to his head, limbs, and torso. Mr. Shand is too frightened to speak with mental health staff, for fear that he will be returned to chains.

70.    Mr. Shand has fully exhausted the CDOC's administrative remedy process for challenging Defendants' practice of denying him adequate mental health treatment and unlawfully placing him in in-cell restraints.

## CAUSES OF ACTION

### First Cause of Action
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments)

71.    This claim is brought against Defendants Semple and Burns in their official capacities, against Defendant Rodriguez in his official and personal

capacity, and against Defendants Cournoyer, Molden, Mulligan, Frayne, and Gagné in their individual capacities.

72.    By the actions, policies, and practices described herein, Defendants have knowingly subjected Mr. Shand to a substantial risk of serious harm and injury from inadequate mental health care.

73.    These actions, policies, and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the ongoing deprivation of constitutional rights.

74.    Defendants have acted, and continue to act, with deliberate indifference to Mr. Shand's serious health, safety, and mental health needs, subjecting him to cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution, as applied to the states through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

75.    Through their direct engagement with Mr. Shand, Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, and Gagné knew or should have known that their subjection of Mr. Shand to prolonged isolation and denial of medical care would cause him harm.  Further, Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, and Gagné knew or should have known that the use of

isolation and denial of treatment in this manner violates clearly established constitutional law.

## Second Cause of Action
### (42 U.S.C. § 1983: Eighth Amendment)

76.     This claim is brought against Defendants Semple and Burns in their official capacities, against Defendant Rodriguez in his official and personal capacities, and against Defendants Cournoyer, Molden, Mulligan, Frayne, and Prior in their individual capacities.

77.     By their actions, policies, and practices described herein, Defendants have knowingly subjected Plaintiff Shand to a substantial risk of serious harm and injury from in-cell restraints.

78.     These actions, policies, and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the ongoing deprivation of constitutional rights.

79.     Defendants have a policy and practice of using in-cell restraints on prisoners in a way that causes pain and injury, is degrading, is done for punitive or retaliatory purposes, and is continued for longer than safety requires. Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, and Prior knew or should have

known that the use of restraints in this manner violated clearly established constitutional law.

80.     By failing to intervene and exercise supervisory authority over illegal uses of force and by authorizing or otherwise condoning such conduct, Defendants have acted and continue to act with deliberate indifference in violation of the Eighth Amendment to the U.S. Constitution, as applied to the states through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

**Third Cause of Action**
(42 U.S.C. § 1983: U.S. Const. art. 6, cl. 2)

81.     This claim is brought against Defendant Semple.

82.     By using his statutory powers under Conn. Gen. Stat. §§ 18-85a or -85b to encumber any monetary judgment in Mr. Shand's favor resulting from this suit, Defendant Semple will unlawfully offset or reduce the federal liability of Department of Correction employees through state law.

83.     Hence, as applied to any monetary judgment in Mr. Shand's favor resulting from this suit, Conn. Gen. Stat. §§ 18-85a or -85b is preempted by 42 U.S.C. § 1983.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Issue a judgment declaring that the acts, omissions, policies, and practices of Defendants and their subordinates, agents, employees, and all other persons acting in concert with them under color of state law, described herein are unlawful and constitute cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

2.      Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting Plaintiff Shand to the conditions described in this Complaint;

3.      Permanently enjoin Defendant Semple, as well as his subordinates, agents, employees, and all other persons acting in concert with him under color of state law, from using Conn. Gen. Stat. §§ 18-85a or -85b to encumber any monetary judgment for Mr. Shand resulting from this suit;

4.      Declare that, as applied to any monetary judgment for Mr. Shand resulting from this suit, Conn. Gen. Stat. §§ 18-85a or -85b are preempted by 42 U.S.C. § 1983;

5.      Award him damages for the loss of his Eighth Amendment rights accomplished by Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, Prior, and Gagné denying him medical care and subjecting him to in-cell restraints;

6.    Award punitive damages against Defendants Rodriguez, Cournoyer, Molden, Mulligan, Frayne, and Gagné for their willful and malicious conduct in denying him medical care and subjecting him to in-cell restraints;

7.    Grant Plaintiff reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794, and other applicable law; and

8.    Grant such other relief as the Court considers just and proper.

Respectfully submitted,

 /s/ Dan Barrett
Dan Barrett (# ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 065105
(860) 471-8471
e-filings@acluct.org

Hope Metcalf (# ct424312)
Lowenstein International Human Rights
Clinic
Yale Law School
P.O. Box 208215
New Haven, CT 06520
(203) 432-9404
hope.metcalf@ylsclinics.org

*Counsel for Mr. Shand*